Ruffin, 0. J.
 

 The'record sets forth, apparently, a report of the whole trial, including all the evidence, and all the views his Honor thought it proper to submit to the jury in his charge, with reasons assigned to the jury for entertaining the opinions delivered to them. It would be much better to state only so much of the evidence as raised a question of law at the trial, and then the opinion prayed and given thereon, with simplicity and precision. That is the mode provided in the Rev. Statutes, c. 31, s. 103, which is taken from the St. 13, Ed. 1 ; and it would greatly promote the convenience of the Judges who preside at trials and the appellate Courts, to adhere to it. This Court does not enter the original judgment, and therefore cannot consider a motion for a new trial; and a report of the whole trial is out of place in the case to be sent to us. Our province is to enquire, nierely, whether there was any error in law committed on the trial, by refusing a proper instruction when prayed for, or giving an improper one. Hence, it is only necessary or proper to put down what one or the other party complained of and excepted to ; and, to do that with directness, in the affirmative or the negative, so that it maybe distinctly known what error is alleged, and the parties not be surprised by decisions in this Court on points different from those intended. We have so often experienced inconveniences from this cause, that we deem it proper to present the subject to the attention of the gentlemen of the bar, arid,
 
 *141
 
 especially, to our brethren who preside on the circuits. A party has no right to ask the Judge to go beyond the matter of liis exception in drawing up the case ; and certainly, all dissertations to the jury upon a doctrine of the law at large, are out of place in an exception, since the matter, for the consideration of this Court, is the instruction refused or given, as applicable to the particular case in hand, and nothing more.
 

 As we collect from the report set out in the record, the dispute is of this nature. The action is debt on a bond against the administrator, with the will annexed, of Timothy Chandler, deceased, and the defendant pleaded
 
 plene administravit,
 
 and no assets
 
 ultra.
 
 The plaintiff endeavored to charge the defendant with certain slaves as assets ; which consisted of two classes — one of them made up by a woman, named Sue, and her son Phil; and the other, of a woman, named Maria, and several of her children. None of the slaves were ever in the actual possession of the defendant, and consequently he was not,
 
 prima facie,
 
 chargeable with them. But the counsel of the. parties had previously agreed in writing, that, if by any suits against any of the persons, who had possession of them, the negroes could be made liable for the debts of Chandler, they should be considered 'liable to the plaintiff’s recovery in this action: it being the object of the parties to try the question of assets in its broadest sense. The effect of this agreement the Court understands to be, that the defendant is tobe liable in the same manner, as if the negroes were actually in his possession. In other words, the decision turns upon the question, whether the negroes were the property of Chandler at his death, so as to constitute a part of the assets for the payment of his debts.
 

 The case, as to Sue and Phil, appears to be as follows. In 1804, Arthur Graham, after devising some of his land • to two of his sons, and giving a negro to a sister, and some small legacies to other persons, made in his will the
 
 *142
 
 following bequest: “ All the remainder of my estate I leave to my wife Elizabeth, to be divided amongst my children as she thinks properand he appointed his wife executrix and his son John executor thereof. The widow took possession of the residue of the estate, which consisted in part of a number of slaves; and before the year 1814, she appointed to several of the testator’s children certain slaves under the will, though to what particular value to each, or in the whole, does not appear ; and the .appointees took them into possession. On the ,24th of September, 1814, Elizabeth, the executrix, and- Timothy Chandler, with whom she had before inter-married, made a further allotment of slaves among the five remaining children of Graham, assigning certain negroes to each of them in severalty and conveying the same: to one of them,,to the value of $1200 ; to three, to the value of $900, each; and to the fifth child, to the value of'$700. This distribution was made in a writing, headed as follows : “ A division of negroes belonging to the estate of Arthur Graham, deceased” ; and, after setting forth the names and values of the negroes allotted to the five children respectively, comes this entry: “ To Timothy Chandler and Elizabeth Chandler, the negroes Frank, old Sue, and young Sue, and 300 acres of land, $1000.” At the foot of the statement is the following declaration and covenant, under the hands and seals of Chandler and his wife; “ Wo, Timothy Chandler and Elizabeth Chandler, bind ourselves to make up to the above named heirs, property to make the negroes valued to the above heirs to the value of $1000, out of the estate of Arthur Graham, deceased.” From that period until his death in 1832, Chandler had possession of the said negroes, old Sue and young Sue, and the negro Phil is the son of one of those women; and, after Chandler’s death, Mrs. Chand-. Her continued in possession of them until after this suit was brought, when she conveyed him ‘ to one of her daughters.
 

 
 *143
 
 Upon the foregoing facts, after some dissertation upon three various constructions, of which the will of Arthur Graham was supposed to be susceptible, and after stating' an inclination to adopt the construction, that the widow took an absolute estate in all the property, with an expectation of the testator, that she would divide with her children, that is to say, by keeping for herself such part, and giving to them such parts as she thought proper, his Honor finally declined giving the jury any opinion on the will. And he stated that he did so, because, “ if the jury were satisfied, that as far back as 1814, Mrs. Chandler made a division with her children, giving them all a share, which they have enjoyed, and keeping for her share Sue and the other property, and this claims of hers had been acquiesced in, and the property kept by the husband as his own, up to his death, then Chandler had, either by the will, or by these subsequent circumstances, a good title to the negroes, and they would be asset in the defendant’s hands.” The jury found their value as assets.
 

 The Court is of opinion, that there was error, both in declining to advise the jury of the legal meaning of the will, and in leaving it to the jury to find, that in 1814 any thing was kept by Chandler and wife, as her share of her former husband’s estate, that is to say, for her own benefit, and as her property, otherwise than as given in the will.
 

 We cannot but understand, that the defendant insisted to the Court, that, by the true meaning of the will, Mrs. Chandler got no beneficial interest in the residue, and prayed an instruction accordingly. Certainly, that question arose directly in the cause, as it concerned the title to the negroes, which the plaintiff contended were assets of Chandler. Therefore, the party had a right to the opinion of the Judge on it; and, to be useful to the jury, it should have been given unequivocally, either, in the affirmative or negative. Indeed, the proper construction was very material to the point, on which the Court did
 
 *144
 
 leave the case to the jury ; for, if, under the will, Mrs. Graham took nothing for herself, it would require some new consideration to authorise the position, that, by dividing some of the negroes
 
 s,mong some
 
 of her children, she acquired an estate to her own use in those which she kept undivided. Now, the construction of the will seems to admit of no doubt. The counsel for the plaintiff in the argument here admitted, that the authorities on the point could not be resisted. The whole legal interest is certainly given to Mrs. Graham. There are no words nor implication to cut her estate down to one for life. But it is equally clear, that she takes as trustee of the whole. There are no words, which give her any thing for a period to her own use ; while there are express words, that she takes for the use of her children. It is simply the ease of a testamentary gift of land and negroes to A. to be divided between B. and C. as A. may think proper. It is difficult to state a plainer trust. The gift is to Mrs. Graham,
 
 to divide.
 
 No terms could.be more explicit. Then, among whom is she to divide ? “ Amongst my children,” says the testator ; and not amongst my children and my wife. The words, therefore, create an express trust, which carries the capital and the profits, until a division, to the children, in such proportions as the mother may appoint. To language so unequivocal, it is vain to oppose suppositions, that, as the testator ought to have provided for his wife, and as he left it to her discretion to make a division among their children, therefore he might have intended to leave it also in her discretion to keep a part or all for herself. If he had such an intention, it is not to be found in the will; but the contrary, very plainly.
 

 Then, as Mrs. Graham was not entitled to any share of the estate for herself, wliat is there, on which it could be left to the jury to find, that in 1814 thererwas a division, in which any thing was allotted
 
 as her share,
 
 to hold af-terwards for herself, instead of holding upon the trusts of the will ? As far as the Court can perceive, there is
 
 *145
 
 nothing whatever. It does not even appear, that she or her second husband then preferred such a claim. No controversy about her rights under the will is shown between her and her children, and, consequently, there could be no compromise — much less is one established affirmatively, as is incumbent on one who insists on Chandler’s title, as acquired by division. It is possible, that she might have claimed a distributive share and dower, upon the principle of the decision in
 
 Miller
 
 v.
 
 Chambers,
 
 which is mentioned in
 
 Craven
 
 v.
 
 Craven,
 
 2 Dev. Eq. 341, wherein it was held, that a widow, to whom the husband left nothing by his will, might thus claim, though she did not dissent from the will. But there is no evidence of a claim of that kind, more than of the other. There is nothing but an apportionment among some of the children, according to the will. Several of the children were not even parties to it, which shows, that it could not have been a compromise of the nature suggested. Now, unless the contrary appear, it is presumed that the executrix and trustee still held in that character the property, which had not been divided; and, as it had been originally divisible, that it was still divisible among the children. And that seems to have been the actual intention in this case; for the agreement at the foot of the allotment is express, that the sum of $1000 is to be made up to each child,
 
 “
 
 out of the estate of Arthur Graham, deceased and it is not stated, that there was any such estate, except the three negroes, and the land then retained by Mrs. Chandler and valued at $1000. It was, therefore, erroneous to submit the enquiry to the jury, without evidence relevant to it. Consequently, Sue and Phil were not assets of Chandler; for, if his legal interest had not terminated with his life, they would, yet, not have been assets, because only those things, in which a person has the beneficial property, are assets, and not those which he holds in trust for another.
 
 Deering
 
 v.
 
 Torrington,
 
 1 Salk, 79.
 

 
 *146
 
 The question concerning the slave Maria and her children, is next to be considered. She and a girl named Peggy, were, in March 1824, purchased by Mrs. Chandler, in the absence of her husband, at the price of $670 ; which was then, and afterwards, paid in securities and cotton belonging to Chandler. By her directions, the bill of sale was made to her son William Graham, in order, as they said, to keep Chandler, who was a drinking old man, from spending the property. The negroes went immediately into Chandler’s possession. In 1827, William Graham proposed to sell Peggy to one of his sisters, and, upon her requiring that Chandler should join in the bill' of sale, he said, “ it is not necessary as the negroes are William’sbut he did join in the deed. At the same time, as one witness stated, Chandler said, that “ he owed William Graham $600 by notes, and that he would let him keep the two girls for the debt, and because he had not got a full share in the division of his father’s estate, and his mother had lived on the land willed to him.” William Graham also then said, he would let his mother keep Maria and her children as long as she lived. The witness saw no notes, and did not know that any had ever been given. Another witness stated that transaction differently, and said that Chandler had sold Peggy to one Lewis Graham, and the latter let William Graham have her. It appears by the division of September 1814, before mentioned, that William Graham was one of the children who got negroes to the value of' #900.
 

 The foregoing is the substance of this part of the case. Upon it, the Court left it to the jury to find, whether the purchase of Maria by William Graham was to his own use, or in trust for Chandler. And upon the supposition, that he took the bill of sale in trust for Chandler, the Court instructed the jury: first, that Chandler could not give his equitable interest in the negroes to William Graham, except by deed of gift; meaning, we suppose, by writing signed and attested according to the act of 1806;
 
 *147
 
 and that he could not sell the negroes to him, without a bill of sale or an actual delivery: And, secondly, “ that at the death of Chandler, it was the duty of his administrator to reduce the negroes into,possession, and call for the legal title; and, as the negroes were in the possession of Chandler at his death, the administrator could not say the legal title was in another, nor, that he could not be charged with the value in a suit át law, upon the ground that they were not legal assets, but only such assets as could be recovered in equity — for it was his duty, having the negroes in possession, to call in the legal title, and, not having done so, he was liable for the value as assets, under the agreement of the counsel.”
 

 This instruction the Court holds to be erroneous also.
 

 We do not understand the agreement referred to as meaning anything more, than that the defendant should be charged with slaves as assets, though out of his possession, provided they would, if in his possession, be assets in this action. In other words, it was not intended to open the enquiry in this suit, whether the defendant did not hold equitable assets, and, if he did, that he should be liable therefor, as if they were legal assets. We suppose his Honor had the same understanding of the agreement, inasmuch as he held, that the value of the negroes was legal assets, either because the defendant was estopped, by the possession of his testator, to deny that the legal title was in him, or because his failing to call in the legal title amounted to a default, which made him liable, at law. But if the meaning of the parties should be mistaken by us, and it really was, that upon this trial, equitable as well as legal assets should be the subject of enquiry, then the agreement must be inoperative at law, inasmuch as the Court cannot assume a jurisdiction, which the law does not confer. Equitable assets do not differ from those that are legal in the circumstance, that the consideration of them belongs to different Courts, more than in the other property of being administered upon principles essentially
 
 *148
 
 different: legal assets being applied according to the dignity of the debts, while there is no precedence among debts as to equitable assets. Consequently, our enquiry is, whether Maria and her children, if actually in the hands of the defendant, would be assets in this suit at law.
 

 The Court is of opinion, that they would not be. It is very probable, that a Court of Equity would declare the purchase to have been made with the funds of Chandler and in trust for him. It would be hardly possible for 'William Graham, when called to answer, to deny it. But assuming that to be the fact, that trust would hot be the subject of legal cognizance in a proceeding of this kind more than in"any other. A Court of law knows nothing of trusts, except so far as they are brought within its jurisdiction by statute. For example, it is a common, method of defrauding creditors, for a debtor to convey property upon a trust for himself; and to prevent fraud, the Cortrt is obliged, to hear evidence of the truth. But that is not for the purpose of executing the trust or giving the creditor the benefit of it, but merely to determine the intent of the conveyance, and avoid it under the St. 13 Eliz. But the St. 29 Car. II, c. 3, and our act of 1812, make land, of which another is seised or possessed in trust for a debtor, liable to be taken in execution, and provides that the purchaser shall get the estate of the trustee as well as the interest of the
 
 cestui-que-trust.
 
 The consequence of that enactment is, that, to certain purposes, the Courts of law are obliged to enquire of the trust — its existence and extent. But the acts, as far as yet quoted, extend only to the case of an
 
 elegit
 
 or
 
 fieri facias
 
 executed. Therefore, when the
 
 cestui-que-irust
 
 died, before execution, his interest descended in equity and would not become assets at law in the hands of the heir or executor, merely -upon its liability to execution against the person from whom it descended or came. For it was necessary, by distinct clauses in the acts, to provide expressly, that certain trusts descended should be legal assets. Now, in
 
 *149
 
 the St. 29 Car. II, the beginning of the 10th section makes the trust of a term as well as of a freehold subject to execution-; yet, when it makes trusts‘assets, it confines them to trusts in fee-simple descended to the heir ; and even as to them provides, s. 11, that the heir shall not he chargeable by reason of any plea, or any default, or any other matter, to pay out of his own estate ; but execution shall be sued of the estate, so made assets in his hands by descent, in the same manner as it is to be at the common law, when, the heir pleading a true plea, judgment is prayed against him thereupon. Thus is exhibited in a remarkable degree, the ease with which, while the creditor is secured, the heir is protected from injury.' For, as it may be difficult- for him to establish the trust, and impossible for him to do it speedily, he is not obliged personally to do ft for the benefit of the creditor ; but the latter is at liberty to go against the trust itself, or the land, out of which he alleges it is to arise, and then he and the person seised, as he says, may contest the question of trust or no trust. In other words, the act gives the creditor of the ancestor remedy
 
 tn rem
 
 only, and does not involve the heir in the litigation with the alleged trustee. Now, the liability of executors is different from that of the heir; for an executor cannot confess specific assets in hand, and require the creditor to take his judgment and execution against them ; but, to the value of the assets found, the executor may be made liable
 
 de bonis propriis.
 
 Therefore, Avith proper caution, the St. 29, Gar. does not interfere with the trust of a term coming to an executor, and make that legal assets; for, besides the difficulty on a jury to try the question of trust or no trust, which in many cases is very nice, wherein conveyances are held upon the most artificial equity to be but securities, there may bo, in every case almost, delays in getting in the legal title, so as to enable the executor to sell the estate to adATantage. Therefore, the English statute, which is confined to lands, carefully
 
 *150
 
 omits to interfere with the liability of ail executor of the
 
 cestui-que-trust
 
 of a term, while it makes the land descended from the
 
 cestui-que-trust
 
 in fee to the heir, though not the heir himself, liable to the creditor. Now, in our act of 1812, the experiment is tried, of extending the liability to be sold under execution to a trust of goods as well as lands. But that is only so far as to authorize the trust of goods to be sold under execution against the
 
 cestui-que-trust
 
 himself, and does not alter the law, which previously determined their character, as assets in the hands of the executor. It is probable, that, by the latter part of the first section, the writer might have intended to convert the trust of goods into legal assets, since there is. a strange confusion of terms, and the words convey some intimation of such an initiation. But upon examination, it is found that the act is only, that “ if any
 
 cestui-que-trust
 
 shall die, leaving a trust
 
 in fee simple”
 
 (not even a term,) “to descend or come to his heir, or executor,
 
 such trust
 
 shall be deemed and is thereby declared to be legal assets in the hands of such heir or executor” : thus using the very words of the St. 29, Car. II, as to the subject, out of which the trust arises, namely, a fee simple, and, therefore, including land only, and then adding “ executor or administrator” — which, in that connexion, is senseless. It is true, the Legislature, becoming aware of the inefficiency of the act in this respect, supplied the omis:sion in 1836, by providing in the Rev. St. c. 46, s. 22, that if any
 
 cestui-que-trust
 
 shall die, leaving
 
 any equitable interest
 
 in any estate real or
 
 personal,
 
 which shall come to his executor, every such equitable interest shall be personal assets in the hands of the executor, for the benefit of creditors. Every person, much versed in the subject, will readily perceive the difficulties in administering this late enactment. A jury and Court of Common Law, before whom the alleged trustee cannot be called to his oath, will probably be found very incompetent to- determine the existence, extent, and value of. all equitable in
 
 *151
 
 terests in chattels, so as to know how to ■ charge the executor. Take for example, the cases of
 
 Hauser
 
 v.
 
 Lash,
 
 2 Dev. and Bat. Eq. 212, and of
 
 Lash
 
 v.
 
 Hauser,
 
 2 Ired. Eq. 489, in the former of which the trust was denied altogether by the mortgagee and executor of the intestate, and only established after a tedious litigation; and, in the latter of which, the equitable- interest of the intestate, after having been established in the former suit, was duly applied as equitable assets, to the debts. But if that had been legal assets, it would have been lost forever to the creditors ; for after a verdict at law upon the question of assets; it necessarily follows, that the parties are concluded, and there can be no relief in equity in respect to legal assets. At law, the issue, when joined, is to be tried at once and finally; while in equity, the assets will be the subject of account from time to time, and applied as got in ; and if there be, or be supposed to be, an equitable interest, directions may be given to institute proper proceedings to determine it. It is to be feared, then, that the only course by which executors can keep themselves secure, will be to sell all such equitable interests, as they stand ; and the consequence will be, that they will always be sold under the disadvantage of the trust being denied, or the amount of the incumbrance being disputed, and they will therefore yield neither creditors nor legatees any thing. It is highly probable, we are apprehensive, that it will turn out, that the statute requires practical impossibilities from Judges and juries. But, however that may be, it is unquestionable, that the act of 1836 does convert these interests into legal assets? and they, of course, retain that character, although it may, in particular instances, be necessary to seek an account of them, and satisfaction in a Court of Equity. Nevertheless, this case -is not affected by that act, since Chandler died in 1832, when the act of 1812 was the only modification of the common law. Therefore, if this were'an express trust, the assets would not be legal, and
 
 *152
 
 be chargeable to the defendant in this action. That the trust was a secret one, and created with the purpose of keeping off Chandler’s creditors — supposing him to have known and assented to it — makes no difference, as it did aiot arise upon a conveyance by Chandler of his' own property, but upon a purchase for him.
 
 Gowing
 
 v.
 
 Rich, l
 
 Red. 553. It would be impossible to hold, independent of the express enactment in 183G, that these slaves were legal assets, for that would, in truth, make a trustee an executor
 
 cle son tort,
 
 if he took possession or recovered the property from a wrong doer, after the death of the
 
 cestui-que-trust,
 
 while, on the other hand, he would be guilty of a breach of trust by not preserving the property. Something of this sort seems to have been in the mind of his Honor, and hence he had to treat the defendant as being guilty of a
 
 devastavit
 
 in not getting in the trustee’s title, and for that default hold the defendant liable for the value of the negroes. But that is manifestly erroneous, No doubt, an executor, who omits to get in and dispose of a trust fund, violates his duty, as much as one who abandons a legal interest. But the point is, where he is to answer for it; and certainly it can only be in that Court, which has a jurisdiction of the trust and can determine, that he has been guilty of the default. Besides, it would change the course of the administration of the fund; for how can the Court of Law ascertain, what other debts of the testator remain unpaid, and what proportion of the fund ought to go to this plaintiff? The character of the assets depends upon their state at the death of the1 testator; and, if the executor gets in equitable assets, they remain equitable. They can be nothing more, when the executor is charged for his omission to get them in. Consequently, these assets could not be en-quired of in this action.
 

 The plaintiff’s counsel insisted in the argument, that, as Chandler took possession of the negroes and held them so long and dealt with them as his own, and there was no
 
 *153
 
 evidence that lie assented that the deed should be made to W. Graham, or that he knew that it had been, the title of Chandler became perfect at law by his possession; and therefore that the other points- were immaterial. It may, indeed be, that Chandler’s possession was adverse, and so
 
 tie
 
 got a title under the act of 1820, c. 1055. But that point was not taken on the trial. At least, it does not appear to have been taken; and at all events, the case was decided on the other, and, as we think, erroneous ground. Therefore, this verdict should be set aside, and the case sent to another jury, before which the plaintiff may, in any manner he can, shew a legal title to the ne-groes in Chandler.
 

 The Court .concurs with his Honor, that the presumption of payment is rebutted fully by the circumstances stated; and the prayer of the defendant on that .point was properly refused.
 

 Per Curiam. Judgment reversed and
 
 venire de
 
 novo.